# EXHIBIT 13

Siri Ostensen
7 Gilliam Lane
Riverside CT 06878

SMCO
c/o SCUA Americas
Att.: Administrator Pension Plan
250 Catalonia Avenue, Suite 304
Coral Gables, FL 33134

November 24, 2003

RE Tom Ostensen
    Money Purchase Pension Plan

As you may be aware of, my husband Tom Ostensen died suddenly on October 12, 2003.
A copy of the death certificate is attached.

As surviving spouse I am entitled to his benefits as of the same date.
My social security no. is 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.

If you need any further information, I may be reached during office hours at (203) 698-1907.

Regards,

Siri Ostensen

Enclosure

# EXHIBIT 14

■ CLAIMS
■ DEFENSE
■ LOSS PREVENTION

**Trimar** DEFENSE SERVICES, INC.

GENERAL CORRESPONDENT OF GARD AS

27 May 2004
Richard Corwin
c/o Trimar Defense Services, Inc.
30 Broad Street (43rd Fl.)
New York, NY 10004-2944

Via Federal Express and
E-Mail (thelanguagecenterinc@worldnet.att.net)
Siri Ostensen
51 Forest Avenue #89
Old Greenwich CT 06870

Dear Mrs. Ostensen:

I am writing to you on behalf of the Committee of The Pension Plan for
Employees of Scandinavian Marine Claims Office, Inc. (the "Plan"), with a copy
to the lawyer representing you in the pending litigation in New York. The
Committee met on May 19th regarding your request to commence surviving
spouse benefits from the Plan. As you and I discussed last week, in connection
with your benefit distribution the Committee needs to resolve the outstanding
Plan loan that you and Thomas Ostensen obtained several years ago. As of April
1, 2004 the balance of the loan was $22,456.20. The loan continues to accrue
interest for each month that it remains unpaid.

You and Mr. Ostensen executed a Promissory Note on which the Committee's
lawsuit was based. Mr. Ostensen's death and your request for surviving spouse
benefits create new circumstances to consider for collection of the loan. Based on
the Loan Security Agreement that Mr. Ostensen executed (copy attached), the
Committee believes that the following options are available under the Plan:

• Your surviving spouse's benefit is equal to a monthly benefit of $512.81
for your life. The Plan could withhold payments from you until such time as the
sum of the monthly payments equals the outstanding principle and interest of the
loan. The Plan's actuary estimates that this would postpone the commencement
of your benefits until July 1, 2008. Thereafter, beginning with August 2008, you
would start receiving monthly checks of $512.81.

• The Plan could offset the benefits otherwise payable to you by the
outstanding loan over the course of the lifetime payments to you under the

---

■ ■ ■    30 BROAD STREET, NEW YORK, NY 10004-2944
TELEPHONE: 1.212.425.5100
FAX: 1.212.425.8147
E-MAIL: TRIMAR@TRIMARNY.COM
WWW.TRIMARNY.COM


gard

**Trimar**

surviving spouse's annuity. This would mean that your surviving spouse's annuity would begineffective April 1, 2004 in the amount of $317.76 per month for the remainder of your life.

- You could at this moment repay the outstanding balance of the loan to the Plan. This would permit the Plan to begin monthly payments to you in the amount of $512.81 for the remainder of your life.

At its meeting, the Committee decided to extend you an opportunity to express your preference among the three options which the Committee would consider in rendering a final decision. In our conversation last week, premised upon only the first two options you suggested that you would prefer the second option. At the time we did not have any dollar amounts available for you to make a reasoned choice or to consider the third option set out above. Now with the three options in mind we expect that you will want to review the options with counsel and your financial advisers. Nevertheless, the Committee would like to resolve this matter quickly, so if you intend to pay the loan in full, we would expect an indication of that from you by June 14, 2004, after which date the Committee will provide you with an updated figure of the outstanding balance and payment instructions. If we have not heard from you by June 14th, the Plan will start your benefits under the second option effective with the July 2004 payment.

In terms of your entitlement to benefits, I have confirmed with counsel to the Plan that you could not have commenced your annuity any earlier than the first of the month following the date that would have been Mr. Ostensen's early retirement date. That commencement date would be April 1, 2004. The Plan will send you an election form for you to complete the formalities of benefit commencement. The Committee regrets the time it took to come to terms with these complex issues and will make sure that the monthly payments for April, May and June are all paid to you as soon as the appropriate amount of the payment is settled.

If you have any questions, please do not hesitate to call me.

Sincerely yours,
Administrative Committee of the Pension Plan for Employees of Scandinavian Marine Claims Office, Inc.
By

Richard Corwin

Enclosure
cc:    Jeffrey M. Eilender, Esq.
        Donald J. Kennedy, Esq.

Siri Ostensen
51 Forest Avenue # 89
Old Greenwich CT 06870

Administrative Committee of the Pension Plan for
Employees of Scandinavian Marine Claims Office, Inc.
c/o Richard Corwin, Esq.
Trimar Defense Services, Inc.
30 Broad Street, 43rd Fl.
New York, NY 10004-2944

June 7, 2004

Via Federal Express and
e-mail corwin@trimarny.com

RE     Pension Plan for Employees of Scandinavian Claims Office, Inc.
         Your letter dated May 27, 2004

Dear Dick,

This is to inform the Pension Plan Committee that I, as indicated to you in our telephone
conversation, would like to select the third option suggested in your letter, i.e. to pay off
the outstanding loan at this time and have monthly payments of $ 512.81 start
immediately, including the overdue payments for April, May and June 2004.

Please let me know the exact amount to be paid and to whom the check should be made
out to as soon as possible.

Regards,

Siri Ostensen

cc:     Jeffrey M. Eilender, Esq.

# EXHIBIT 15



THE LANGUAGE CENTER INCORPORATED ⬛⬛⬛⬛⬛, P.O. BOX 520, RIVERSIDE, CT 06878-0520,   TEL 203/698-1907 FAX 203/698-2043

**To:  Dick Corwin**

**From:  Siri Ostensen**

**Date:  6/28/04**

**Number of pages INCLUDING cover: 4**

**Comments: RE Pension Plan for Employees of Scandinavian Marine Claims Office**
                     **Inc.**
                     **Loan repayment**

**Dear Dick,**

**Attached are copies of the cover letter and check FedExed to Mr. Soos at
Oppenheimer today.**

**Regards,**

Siri Ostensen
51 Forest Avenue # 89
Old Greenwich CT 06870

Tel      (203) 637-0321
Fax      (203) 698-2043
e-mail   thelanguagecenterinc@worldnet.att.net

Mr. Eric Soos
Account Executive
Oppenheimer & Co.,
200 Park Avenue
New York, NY 10166

BY FEDERAL EXPRESS

June 28, 2004

RE Pension Plan for Employees of Scandinavian Marine Claims Office, Inc.
    Loan repayment

Dear Mr. Soos,

Please find enclosed a bank check in the amount of $ 22,918.90 to cover the outstanding amount as per Dick Corwin's instructions.

I will expect the benefit payments – including benefit arrearage from April 1, 2004 – to commence immediately.

Regards,

Siri Ostensen

cc      Richard Corwin, Esq.
        Jeffrey M. Eilender, Esq.

**OFFICAL CHECK**

THE
BANK OF
NEW
YORK

23-97
1020

144429535

Issued By Integrated Payment Systems Inc., Englewood, Colorado
Bank One, NA, Denver, Colorado

06/28/2004

PAY    TWENTY TWO THOUSAND NINE HUNDRED EIGHTEEN DOLLARS AND 90 CENTS    $    22918.90

FOR    SIRI M. OSTENSEN

DRAWER: THE BANK OF NEW YORK

TO THE
ORDER
OF

Pension Plan for Employee
of Scandanavian Marine
200 Park Avenue
New York, NY 10166

525008

AUTHORIZED SIGNATURE - ID#

621840

⑈340565⑈ ⑆102000979⑆ 6800L444295358⑈

VARIABLE TONE BACKGROUND AREA OF THIS DOCUMENT CHANGES COLOR GRADUALLY AND SMOOTHLY FROM DARKER TONES AT BOTH TOP AND BOTTOM TO THE LIGHTEST TONE IN THE MID

# EXHIBIT 16

 **Scandinavian Marine Claims Office, Inc.**

Stamford Harbor Park
333 Ludlow Street
P.O. Box 12002
Stamford, Connecticut 06912-0020 USA
203-975-7100
Fax: 203-975-7146
Fax: 203-975-7862
Telex: WUI 669535
Graphnet 3722107

October 7, 1992

Mr. Havar Poulsson
Assuranceforeningen Skuld

Mr. Jan Lunde
Unitas Gjensidig Assuranseforening

Mr. Knut Lund
Uni Storebrand International Insurance A/S

            Supplementary Report - Pension Plan

Please find enclosed a copy of our actuaries' proposed plan
design for the amended plan for SMCO. AIMS' presentation is
self explanatory, however, I like to highlight and summarize
certain purposes/objectives and cost aspects as follows:

1. Purpose/Objectives

    A.  To increase overall benefits to all employees under
        the defined <u>benefit</u> plan by reducing time of service
        from 30 years to 25 years in order to receive
        maximum distribution at retirement age.

    B.  Adopt a defined <u>contribution</u> plan - the 3% money
        purchase plan, which will increase benefits in
        excess of a defined benefits plan for employees in
        their thirties and younger. The defined
        contribution plan will in effect be the only
        obligation in respect of such employees as they will
        not receive any monies from the defined benefit
        plan.

    C.  Provide up to 60% of pay for certain select senior
        employees under a non-qualified plan who would not
        receive the advantages of a defined contribution
        plan.

Barnett Bank Plaza • One East Broward Boulevard, Suite 1410 • Fort Lauderdale, Florida 33301 USA
305-765-0707 • Fax: 305-765-1901 • Telex Graphnet 3750970

SM 000130

Supplementary Report - Pension Plan
October 7, 1992
Page 2


2.  Cost

    A.  Current plan formula provides for a cost as of
        1/1/92 of $204,296 or about 14.5% of eligible annual
        salaries.  At this level this dollar cost will
        increase in the future if we do stay with this plan.

    B.  The proposed plan formula has an overall cost of
        $209,633, as of 1/1/92, however, the cost will
        decline in the years to come.

        The defined benefit plan cost will decrease with
        attrition and the cost of employees in their
        thirties or lower will be limited to 3% of payroll.
        The non-qualified plan cost will remain constant in
        dollars and in effect decrease in percent of future
        payroll cost as well as through attrition.

We strongly recommend the adoption of the proposed plan
formula as presented by AIMS.


Tom Ostensen
Tom Ostensen

to/ep (196)

Proposed Plan Design Alternatives

for the

Pension Plan for Employees

of

Scandinavian Marine Claims Office, Inc.

Prepared by

Actuaries and Information Management Services, Inc.

SM 000132

**Purpose:**

The purpose of this study is to examine the feasibility of improving benefits for certain employees whose continued employment is in the best interest of the Employer, while maintaining reasonable costs for the provision of basic benefits for all employees.

**Current Plan:**

The current plan, a defined benefit program, provides for an annual benefit equal to 50% of the highest three year average compensation of each eligible employee. Those employees who have not completed 30 years of service at normal retirement will have their benefit reduced by 1.667% for each year of service less than 30.

**Proposed Program:**

Specifically, we have endeavored to provide select employees with a full 60% of compensation benefit through a combination of retirement income sources utilizing both qualified and non-qualified programs. Before arriving at our recommendations, we examined the current Employer provided benefits as well as any other benefit entitlements to which each employee may be eligible.

In order that we may keep recurring administrative costs at a reasonable level, by eliminating expensive non-discrimination compliance testing, we recommend that the defined benefit plan formula be amended to take full advantage of the "Safe Harbor" provisions of the proposed Internal Revenue Code Section 401(a)(4) regulations. Therefore, we suggest amending the plan formula to provide a full 50% of pay after 25 years of service. In addition, we recommend the adoption of a money purchase plan providing for a contribution of 3% of compensation for all eligible employees. This plan will operate in a floor/offset arrangement in conjunction with the defined benefit plan. A description of floor/offset arrangements follows.

Finally, we recommend the adoption of a non-qualified retirement plan which will provide for the difference between 60% of pay and the qualified plan benefit for those select employees whose continued employment is most beneficial to the firm.

**SUMMARY OF PROPOSED PLAN PROVISION CHANGES
FOR THE PENSION PLAN FOR EMPLOYEES OF
SCANDINAVIAN MARINE CLAIMS OFFICE, INC.**

**Recommended Qualified Plan Changes:**

1) Adoption of a 3% money purchase plan.

2) Amend defined benefit formula to provide 50% of pay upon completion of 25 years of service.

3) Add floor/offset feature to defined benefit plan.

4) Change certain actuarial assumptions to take advantage of the current expected rates of return and to reflect the Company's changing census demographics.

**Non-Qualified Plan:**

Adoption of a non-qualified deferred compensation program whose target is to provide a total benefit package equivalent to 60% of pay for certain select employees. Where significant benefits are available to the employee which fall outside Employer discretion, we have considered such benefits in determining the eligibility for participation in this program.

**Summary of costs for 1992:**

In order that we may provide a basis for the comparison of costs under the current and proposed plans we have calculated the plan costs on two different bases:

1) Projected 1992 costs based on current plan provisions and actuarial assumptions.

2) Projected 1992 costs based on changing the defined benefit plan formula to provide 50% of pay upon completion of 25 years of service, adjusting the actuarial assumptions and adding a floor/offset feature to the plan through the adoption of a 3% of pay money purchase plan. Money purchase plan benefits are projected and converted utilizing the same actuarial assumptions employed in determining the defined benefit plan cost.

SM 000134

## FLOOR/OFFSET ARRANGEMENTS IN GENERAL

Under a floor/offset arrangement, a company establishes both a defined contribution and a defined benefit plan.

The defined benefit plan is actually the floor plan as this is the plan that will guarantee a minimum level of retirement benefit for all participants.

The contributions made to the defined contribution plan are accumulated with earnings to retirement and are converted to monthly benefits (annuitized). The monthly benefit derived from the defined contribution plan is then subtracted from the benefit generated under the defined benefit plan.

If the annuitized defined contribution account produces a benefit in excess of the guaranteed defined benefit, the participant will receive the greater benefit and no monies would be payable from the defined benefit trust. This will be the case for most participants who enter the program in their twenties or thirties.

One of the chief advantages of such a program is it's broad appeal. Most younger participants tend to appreciate the individual account type of plan better than the defined benefit plan because they can see the increase in the account value as time goes by. At the same time, the company is taking responsibility for providing a guaranteed pension to its older, longer service employees who would not ordinarily be able to accumulate the funds necessary to provide their benefits under a defined contribution plan which was not established until midway through their careers.

We expect that the long term cost of this arrangement will gradually shift from the defined benefit portion to the defined contribution portion, resulting in a significant savings when measured as a percent of compensation. This result is achieved by taking advantage of the long term compounding of contributions made for employees whose participation in the program commences at younger ages and the attrition of older employees through retirement.

In summary, the floor/offset approach results in significantly improved benefits for employees at all pay levels by optimizing the employer's contribution dollars.

## THE FULL FUNDING LIMITATION CREDIT

The "full funding limit" is a two tiered test which must be performed annually on all defined benefit plans subject to the minimum funding standards of ERISA. The purpose of this test is to measure the permissible amount of deductible contribution which may made to the plan.

The "full funding limitation" represents the excess, if any, of plan liabilities over plan assets. If plan assets exceed plan liabilities, the plan is considered fully funded and no contribution is required. As the present value of the assets approaches the current accrued liability, deductible plan contributions may be restricted.

When an offset feature is added to a plan, the projected benefits under that plan are reduced to reflect the value of the future accumulations under the new plan. This reduction in projected future liabilities decreases, for funding purposes, the current plan liability and can trigger the full funding limitation. The full funding credit represents the difference between the plan's normal cost as calculated under the plan's funding method and the maximum deductible contribution permissible under the Internal Revenue Code.

In future years, if plan liabilities increase at a greater rate than the value of plan assets, then the full funding limit would no longer apply and contributions would again be required as determined under the plan's funding method.

We expect that the offset attributable to the ongoing money purchase contributions will continue to have a positive effect on the relationship between plan liabilities and the value of plan assets as long as the assumed rate of return on investments is met or exceeded. If the plan's investment return drops below 9%, then additional contributions may be required.

SM 000136

## EXHIBIT I

### PENSION PLAN FOR EMPLOYEES
### OF
### SCANDINAVIAN MARINE CLAIMS OFFICE, INC.

1) Projection of costs under the current plan formula and actuarial assumptions.

| | |
|---|---|
| Defined Benefit Plan Normal Cost as of January 1, 1992 | - $ 190,931 |
| Interest @ 7.0% | 13,365 |
| Full Funding Credit | 0 |
| Total deductible plan cost - | $ 204,296 |

2) Projection of costs under the amended plan formula utilizing adjusted actuarial assumptions and the offset feature attributable to the addition of the 3% Money Purchase Plan.

| | |
|---|---|
| Defined Benefit Plan Normal Cost as of January 1, 1992 | $ 100,698 |
| Interest @ 9% | 9,063 |
| Full funding Credit | (50,008) |
| Total Defined Benefit Plan cost - | $ 59,753 |
| Money Purchase Plan cost | 46,061 |
| Total deductible plan cost - | $ 105,814 |
| Non-qualified Plan cost - | 103,819 |
| Total cost of all benefits - | $ 209,633 |

SM 000137

EXHIBIT 17

SCANDINAVIAN MARINE CLAIMS OFFICE, INC.

**Minutes of the Meeting of the**
**Board of Directors**
**Virginia Beach, Virginia**
**October 19, 1992**

The meeting of the Board of Directors of Scandinavian Marine Claims Office, Inc., a New York corporation, was held on October 19, 1992, at 10:00 AM at the Virginia Beach Resort and Conference Center.

The following Directors were present:

>       Havar Poulsson, Chairman
>       Jan Lunde
>       Knut Lund

constituting the entire Board of Directors of the Company.

The following were present by invitation:

>       Tom Ostensen, President
>       Robert Jones, Treasurer and Secretary

Mr. Havar Poulsson, Chairman of the Board, called the meeting to order. On motion duly made, Mr. Jones was elected Secretary of the meeting. Due and proper notice of the meeting had been given.

1.  <u>Reading of the Minutes of the Meeting of the Board of Directors</u>

    A.  The Minutes of the May 26, 1992, Board of Directors' meeting in Bergen, Norway, were circulated in advance. On motion duly made, seconded and carried, the Minutes were approved and the reading thereof waived.

2.  <u>Action Items</u>

    A.  <u>The Operations and Accounts of the Company</u>

        1.  The Statement of Operations and Retained Earnings for the Eight Months Ended August 31, 1992, was reviewed and discussed by the Board who found the Statement to be satisfactory.

The Board agreed to allocate administrative expenses on an actual head count basis for the purpose of preparing the 1993 budget.

A Composite Statement of Operations for the Florida Office for the same period was also reviewed.

Although the Florida hull operations showed a small loss for the first eight months of the year, it was reported, however, that the actual income was higher, therefore the results for the year should be a break-even. While on the P&I side, the loss can in part be contributed to the effect of Hurricane Andrew on office operations.

Mr. Arvind Rikhy is presently engaged by the Company on a consulting basis with the intent to hire him as a surveyor for a Houston office. Mr. Rikhy will temporarily work from his home in order to keep cost at a minimum

B.   The Budget for 1993

In reviewing the budget, the Chairman stated that the loss for the year 1993 on the P&I side could be absorbed by a reduction in budgeted corporate travel and entertainment expenses. The President believed that corporate expenditures were not the issue but that the Company is over-staffed unless Skuld utilizes SMCO more fully. The Chairman then explained that the Company may be bypassed with new cases because its rates were too high compared to other legal firms. The President responded that the only complaint about rates charged by the Company was received from Frank Riley. In reply to Frank Riley, it was explained in detail that the Company's hourly rate is lower than the majority of legal firms and in fact it is not the hourly rate that ought to be the issue, but the number of hours charged. As an overall cost, SMCO charges substantially less time than most law firms do for similar work. Mr. Knut Lund interceded and commented that any cost controls to be instituted must first begin with a review of the Company's present staff. Mr. Lund continued that if the Company is over-staffed then a reduction in staff ought to be considered which would also reduce other costs in kind. Mr. Jan Lunde expressed the view that the fees charged by SMCO are considered to be on the high side. However, his thoughts were that if first class services are wanted in the greater New York metropolitan area then costs are going to be high.

SM 000100

The discussion ended with the Chairman stating that he and Mr. Ostensen will review at a later date a proposed General Services invoice on an annual basis in lieu of an increase of fees to subsidize any P&I losses. In addition, the 1993 budget will be amended to reflect a breakeven for P&I. Mr. Lund then proceeded to recommend to prepare the amended 1993 Budget using 1992 estimated actual amounts instead of 1992 Budget figures as a comparison to the 1993 Budget. The recommendation was approved.

C.  **Employee Benefits**

1.  **Pension Plan**

The Chairman stated that one purpose of this meeting was to consider and discuss the adoption of an amendment to the pension plan of the Corporation. A report on the amendment had been presented in advance to the Board members prepared by Actuaries and Information Management Services, Inc. The report proposed a floor offset concept which in effect will:

a.  provide an overall benefit for all current employees under the defined benefit plan;

b.  adopt a defined contribution plan which will provide a 3% money purchase plan; and

c.  provide a retirement benefit program of up to 60% of pay for certain selected employees under a non-qualified plan.

Following a discussion thereof, upon motion duly made, second and carried, it was

RESOLVED, that the proposed Floor-Offset Pension/Retirement Plan, heretofore considered and discussed, and copy of which report by AIMS, was ordered annexed to and the same hereby is adopted in principal substantially in the form attached, including any amendments required to secure a favorable determination from the Internal Revenue Service.

RESOLVED FURTHER, that the related trust agreement with the bank or other funding institution to become a part thereof, be, and the same hereby is adopted and any such current trust or fund custodial documents may be modified as required to carry out the foregoing resolution.

SM 000101

RESOLVED FURTHER, that the members of the committee to administer the plan in accordance with the provisions thereof are authorized to so act.

RESOLVED FURTHER, that the adoption of the proposed Floor-Offset Plan and its related agreements are effective as of January 1, 1992.

RESOLVED FURTHER, that the Corporation shall indemnify members of the committee against personal financial loss resulting from liability incurred in the administration of the Plan, unless such liability and loss were caused by such individual's gross negligence or willful misconduct.

RESOLVED FURTHER, that the proper officers of the Corporation be and they hereby are authorized and directed to:

a. take all appropriate steps to secure a determination by the Internal Revenue Service that the Floor-Offset Plan and its related trust and/or custodial agreements and all other related documents meet the requirements of Section 401(a) of the Internal Revenue Code of 1986;

b. certify these resolutions or any part thereof to the Internal Revenue Service and to any other necessary and appropriate person, corporation or governmental department;

c. execute all other documents and certifications and to take all other appropriate steps in order to comply with any other legal or technical requirements pertaining to the adoption of the Floor-Offset Plan and its related trust and other agreements; and

d. make such changes in the Floor-Offset Plan or its related trust and other agreements as the officer executing the same may deem necessary or desirable in order to secure the above-mentioned Internal Revenue Service determination or in order to meet other technical or legal requirements, approval of any such changes to be conclusively evidenced by his signature thereto.

RESOLVED FURTHER, that the proper officers of this Corporation be and they hereby are authorized and directed to take all such steps and execute and deliver all such documents and other instruments as may be necessary or appropriate to carry out the foregoing resolutions.

2. Bonus 1992

The Board approved an employee bonus of 0 to 12% for 1992, based on merit, with Mr. Ostensen to have discretion as to the amount to be awarded to each employee.

3. Salary Adjustments 1993

The Board approved a general salary increase of 4% in addition to a maximum 3% increase based on merit with Mr. Ostensen to have discretion as to the precise amount of the increase to be awarded to each employee.

D. Fee Rate Adjustments 1993

Mr. Ostensen proposed to the Board a general fee increase of 5% for Hull and P&I rates which he indicated was necessary to stay abreast of inflation and staff increases in the P&I department. The Board discussed the increases and agreed that the rates will remain the same but if the hull case load decreased drastically during the year then the hull rates should be reviewed by the Board to possibly offset any deficits. Mr. Poulsson opposed a fee increase for P&I.

E. Line of Credit

The President requested for approval from Mr. Poulsson if Skuld would grant the Company a line of credit due to temporary cash flow needs caused by the Company's financing of employees' housing. Mr. Poulsson believed that a line of credit could be extended by Skuld if the Company paid interest at the market rate.

SM 000103

F.  Relocation of the Florida Office

Mr. Ostensen reported to the Board that it would be prudent to relocate the Company's Fort Lauderdale office to Miami since the majority of our business brings us to that area. The Company signed a letter of intent for a Miami office at a slightly higher rental than the Fort Lauderdale premises as the Miami office space is larger. Mr. Ostensen then circulated a schedule of cost comparison between the two offices. After a discussion, the Board approved the relocation of the office to Miami.

G.  Parker Wise

Mr. Ostensen reported to the Board that the Company holds a mortgage in the amount of $363,000 due from Mr. Parker Wise, the former President of the Company. Mr. Ostensen related that Mr. Wise is presently unemployed with a closing on his house scheduled for early January 1993, and asked if the Company could accept $300,000 in settlement of the mortgage debt due to Mr. Wise's financial difficulties. The Board approved $300,000 as settlement of his outstanding debt.

3.  Report Items

A.  Accounts Receivable

The Board was advised that as of August 31, 1992, the accounts receivable were $274,000 with $116,000 outstanding over 60 days. As of October 16, 1992, the Company received $20,000 from subsequent cash collections for receivables over 60 days past due, leaving an at-risk balance of $96,000 which includes one invoice totalling $55,000. The Company believes all receivables are collectible.

4.  Other Matters

A.  Staffing

Mr. Lund inquired about whether the Company was properly staffed as it relates to the effects on the budget. A general discussion took place regarding the staff whereby it was understood by those present that the Company appeared to be over staffed as follows:

| Hull Technical | 1 marginal person |
| Hull Claims | 1/2 person |
| P&I | 2 claims handlers |

SM 000104

The Board's opinion was that if the case load doesn't increase then staff cuts may be warranted. The subject was deferred until the next board meeting whereby the budget will be reviewed for any significant overruns in which case the staff will be analyzed first.

5.    Time and Place of Next Board Meeting

The next meeting of the Board of Directors is to be held on March 25, 1993, at 10:00 AM at the offices of Assuranceforeningen Skuld, Oslo, Norway.

There being no further business to come before the meeting, upon motion duly made and seconded, the meeting was adjourned.


Robert Jones

(294)

# EXHIBIT 18

## SCANDINAVIAN MARINE CLAIMS OFFICE, INC.
### Stamford Harbor Park
### 333 Ludlow Street
### P.O. Box 120020
### Stamford, CT 06912-0020

| | | | |
|---|---|---|---|
| Telephone: | 203-975-7100 | Telex: | WUI 669538 |
| Telefax: | 203-975-7146 | Telex: | Graphnet 3722107 |
| | 203-975-7862 | | |

### TELEFAX COVER SHEET

DATE:         September 19, 1994

TO:           Skuld Oslo
ATTN:         Havar Poulsson
TELEFAX:      011 47 22 00 23 86

FROM:         Tom Ostensen

**NO. OF PAGES INCLUDING THIS SHEET:**
If you do not receive all pages, please call Ellen at 203-975-7100.

This message is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this information is not permitted. If you have received this transmission in error, please immediately notify us by telephone to arrange for return of the documents. Thank you.

RE:           Leif Chr. Husjord's Early Retirement

Dear Havar:

Reference is made to our meeting on August  30th and your letter dated September 16th in the above captioned matter.

The SMCO pension plan provides for 50% of the average pay of an employee's last 36 month's salary provided that the employee has at least 25 years of service.  At the Board Meeting in Virginia Beach on October 19, 1992, it was decided that the company would "provide a retirement benefit program of up to 60% of pay for certain selected employees under a non-qualified plan".

This decision applies to LCH.  His normal retirement date is December 1, 1997, at which time he will be 65, however, he has expressed his desire to retire earlier at the age of 63.

Our actuaries, AIMS, have provided me with a computation of his retirement benefits in a letter dated August 17, 1994, copy of which is attached.

According to AIMS his adjusted benefit under the SMCO qualified pension plan for early retirement at the age of 63 is $5,005.36. That benefit is based on 50% of final average pay.  An adjusted 60% retirement benefit will be $6,843.63 per month of which $1,838.26 will come from SMCO and will be paid out of operating expenses.  Based on the decision made in Virginia Beach, this is what LCH is entitled to.

11/05/01  15:56 FAX 3055298874          SCUA AMERICAS                    ☐006

Havar Poulsson
September 19, 1994
Re:  LCH
Page 2

If we were to offer LCH unadjusted retirement benefits at 60% of
final average pay, he would receive a total of $8,328.68 per
month or a difference of $1,485.06 per month over and above what
he is entitled to.   The total annual cost to SMCO will be
$39,879.84 for an unadjusted benefit of 60% ($1,838.26 monthly
plus $1,485.06) over and above what he will receive from the
qualified pension plan.   This additional payment will run for
LCH's life, or a maximum of 10 years in the event he passes away
before the age of 73, in which case his spouse will receive the
remainder of the 10 annual payments.

LCH's retirement will not require external replacement as at the
last Board Meeting we agreed that the undersigned will assume
LCH's duties.   Consequently, I recommend that we accept the
additional cost of $17,820.72 in order to bring LCH up to a full
unadjusted 60% retirement benefit.

If anything unclear please do not hesitate to give me a call.

Regards,

Tom Ostensen

to/ep 376

SM 001735