# EXHIBIT 31

MINUTES of a Meeting of the Board of Directors of Scandinavian Marine Claims Office, Inc. held on Wednesday 17 January 2001 at 12.00 p.m. at the offices of Gard Services AS, Fyllingsdalen, Norway.

Present:          Mr. Karstein J. Espelid, Chairman
                  Mr. Tom Midttun
                  Mr. Per Gustav Blom

**1.    Formalities.**

Karstein Espelid took the Chair and Per Gustav Blom agreed to act as Secretary to the Meeting.

**2.    Approval of minutes from Meeting held 9 January, 2000.**

Tom Midttun proposed to change the wording of the second paragraph under item 6 on the agenda. With this change, the minutes were approved.

**3.    Hold Harmless declaration – remuneration to Board members.**

The Chairman referred to letters that had been sent to Norwegian Hull Club and Gard Services as ultimate shareholders and to the parent company. Gard Services had executed the Hold Harmless declarations and forwarded these to Norwegian Hull Club for execution.

With regard to remuneration to Board Members, there had been oral comments that the two Board members representing the ultimate shareholders should not be compensated by the Company. So far, there had not been any formal reply to the letter regarding Board remuneration. Remuneration will be decided by the parent company.

**4.    Sale of SMQI, Inc.**

The Chairman referred to the Board's meeting with Arne Selvik on 9 January 2001 and the authority given to Mr. Selvik at the last Board Meeting to sell SMQI Inc. The Board would like to have more detailed information on the financial consequences of the sale, especially regarding what has been sold and which liabilities remain with SMCO Inc. As regards the Stock Purchase Agreement, the precise meaning of § 3 – Formulae – should be clarified. Remaining clients with SMQI / HMMS should also be verified. The Chairman will write to the chairman of the parent company regarding these issues.

**Redacted**

BERGEN HELL CLUB                    - SMCO CORAL GABLE    ☑006/010

2

## Redacted

Tom Midttun will check with the chairman of the parent company whether former employees have any rights or claims against the Company in addition to claims for pensions under the qualified and nonqualified schemes. He will also ask whether any of the former employees has served notice under the 180 days rule mentioned above.

The Board then referred to the minutes from the Board Meeting of SMCO AS held on 18 December 2000, which sets out the mandate for the Board of SMCO Inc. in relation to liquidation of the Company.

## Redacted

A copy of the nonqualified pension plan for Mr. Carl Cederstav and promissory and mortgage notes relating to the loans extended to former employees were tabled. The nonqualified pension plans for all former employees were identical.

A number of issues relating to pension liabilities will have to be further investigated. The Board agreed that

## Redacted

- Per Gustav Blom will check termination of life polices for a cash consideration of USD 64 000 with the chairman of the parent company.
- Per Gustav Blom will ask SCUA Americas for specification of loan balances to former employees.



BERGEN HULL CLUB                    → SMCO CORAL CABLE    ⓐ007/010

3

- Per Gustav Blom will ask Erik Kappelin whether there is any formal obligation to pay PK Nayyar any bonus or compensation regarding loss on 401 K plan following the outcome of his legal proceedings against the Company.
- Any payment for vacation to Tom Østensen be put on hold until all balances between Mr. Østensen and SMCO Inc. and SMQI inc. have been decided and final settlement agreed.

**7.    Legal proceedings against Ms. Coiffi and Mr. Hudson.**

The Board is not familiar with this case, which relates to former employees of SMQI, Inc. abruptly leaving the company.

The Chairman will ask the chairman of the parent company for information on the case and who the parties to the case will be if SMQI, Inc. is sold.

**8.    Financial position – funding needs.**

Per Gustav Blom will ask SCUA Americas Inc. to prepare the 2000 accounts for the Company as soon as possible.  The Board is particularly interested in a specification of the various items on the balance sheet.

Per Gustav Blom will also ask the actuary, Kevin Sweeney, to prepare updated estimates of both qualified and nonqualified pension liabilities as soon as possible.

**9.    Reporting to the Chairman of SMCO AS.**

A copy of the minutes from this Meeting will be sent to Mr. Selvik, referring to a separate letter that the Chairman will send regarding consequences of a bankruptcy.

Mr. Selvik will be asked whether he requires further information.

**10.    Any other business.**

The next meeting will be held at Norwegian Hull Club's offices in Bergen on 1 February at 12.00 noon.  At this Meeting, the Board will seek to schedule the forthcoming steps that needs to be taken in order to arrive at final settlements with the former employees.

There being no further business, the proceedings then concluded.

_____

Karstein J. Espelid

(Chairman)

_____                    _____

Tom Midttun                                                        Per Gustav Blom

SM 000770

# EXHIBIT 32

FELLES STYREMØTE

I

NORSK SKIPSASSURANSEFORENING

OG UNITAS

ble avholdt 27. februar 2001 kl. 10.00 i Norsk Skipsassuranseforening's lokaler i Handelens og Sjøfartens Hus, Bergen.

Fra Norsk Skipsassuranseforening møtte:    Knut J. Meland
    Bjørn Sjaastad
    Olav Lunde
    Jan Pedersen
    Nils Aardal
    Sissel Bøyum Skjelten

Sverre A. Farstad og Tom C. Steckmest hadde meldt forfall.

Fra Unitas møtte:    Jan Fosse
    Terje Adolfsen
    Atle Bergshaven
    Emil Gamborg
    Knut Evensen

Fra administrasjonene møtte John Wiik, Torleiv Aaslestad og Per Gustav Blom. I tillegg møtte Norsk Skipsassuranseforening's revisor, KPMG AS v/ Ivar Mjelde under sakene 8, 9 og 10, Foreningens aktuar under sakene 9 og 10, Pål Nytveit under sak 9 samt Per Berge under sak 14.

**01/01  Godkjennelse av referat fra styrets møter.**

Utkast til referat fra styremøte i Norsk Skipsassuranseforening 7. desember 2000 ble gjennomgått og godkjent.

**02/01  Kopi av protokoll fra møte i representantskapet.**

Utkast til protokoll fra møte i representantskapet i Norsk Skipsassuranseforening 8. desember 2000 ble gjennomgått. Styret bemerket at representantskapet hadde hatt en grundig gjennomgang og diskusjon omkring Foreningens investeringsstrategi. Representantskapet hadde i denne forbindelse stilt spørsmål ved om den forventede meravkastning ved den valgte strategi er tilstrekkelig til å forsvare den økte risiko som strategien innebærer.

I tilknytning til protokollat av redegjørelse av SMCO saken under sak 10, mente styret at referatet ikke var dekkende. Kritikken som styret har reist mot saksbehandlingen i SMCO saken er sterkere enn det som fremkommer av protokollen.

CONFIDENTIAL

NW    000185

På bakgrunn av denne saken mener styret at styrets formann bør få anledning til å se utkast til protokollat av de redegjørelser han har gitt i styret. *(handwritten)*

03/01    Kopi av protokoll fra møte i kontrollkomiteen.

Det var ikke fremlagt protokoll fra møte i kontrollkomiteen.

04/01    Korrespondanse med revisor.

Fremlagt brev nr. 14 fra KPMG AS ble gjennomgått og diskutert. Styret påpekte at rapporten er lite konkret i forhold til SMCO saken og at styret ønsker en mer inngående vurdering i forbindelse med den endelige rapporten etter årsopgjøret. Generelt ønsker styret at revisors brev til styret og ledelsen skal være mest mulig konkrete og gjerne inneholde momenter som styret kan bruke direkte i sin oppfølging av saker eller for å ta initiativ overfor administrasjonen.

Styret stilte spørsmål til hvordan revisor følger opp "ikke rutinemessige transaksjoner" i driften av Foreningen.

05/01    Den aktuelle situasjonen.

John Wiik redegjorde. Når det gjelder fusjonsprosessen, begynner de ulike tema som har vært diskutert og behandlet nå å finne sin avklaring. Eksternt har administrasjonen ikke mottatt noen negative reaksjoner fra medlemmene.

Wiik gikk deretter gjennom utviklingen i brutto lønnsomhet, der det har vært en økning i ratene innen LoH ved fornyelsene i januar. I det norske markedet viser premietallene for 2000 en konsentrasjon, idet Gard Services og NHC til sammen har 72,8 % av tegnet premie, hvorav NHC har 32,7 %.

Torleiv Aaslestad redegjorde for to totaltap som har inntruffet i 2001 og som belaster Unitas 2000 årgang innen kasko. Brutto andeler er USD 1,44 mill. og USD 1,68 mill, mens egenregning er USD 25.000 per hendelse.

Styret ba administrasjonen fremlegge forslag til rapportering av større havarier hvert kvartal samt rapportering av større saker, uansett karakter, mellom styremøtene.

Wiik opplyste at NHC hadde vunnet anbudet om drift av Den Norske Krigsforsikring's forsikringsvirksomhet. Det var fortsatt diskusjon mellom DNK og Foreningen om minimum løpetid for avtalen. Avtalen vil bli fremlagt for styret til endelig godkjennelse.

Styret tok redegjørelsen til etterretning.

06/01    Status og avkastning finansportefølje.

Per Gustav Blom redegjorde for utviklingen i 2000 i de viktigste finansmarkedene samt avkastning og status på investeringsporteføljen pr. 31. desember 2000 og 31. januar 2001. Styret tok redegjørelsen til etterretning.

2

CONFIDENTIAL

NW    000186

**07/01   Utestående saker for behandling.**

Den fremlagte oversikt over utestående saker ble gjennomgått.

**08/01   SMCO AS / SMCO Inc.**

Styret diskuterte og stille spørsmål til den fremlagte dokumentasjon vedrørende SMCO Inc. Styret sluttet seg til det fremlagte forslag til prinsipper for avvikling av SMCO Inc. ved at usikrede kreditorer generelt får fullt oppgjør og at tidligere ledende ansatte får dekning under Non Qualified pensjonsordning som ikke overstiger USD 750 000, hvilket gir en beregnet samlet underdekning på USD 3,25 mill.

Wiik redegjorde for forhandlingene med Gard om dekning av underbalansen i SMCO systemet.  Styret sluttet seg til det fremsatte forslaget om likedeling av tap etter fradrag av USD 125.000, og ga samtidig uttrykk for undring over den holdning som Gard har utvist i denne saken.

Når det gjelder videre drift og organisering av SMCO / SCUA systemet, vil administrasjonen komme tilbake til styret med dette som egen sak.

Den siste saken som var fremlagt vedrørende SMCO gjaldt handlinger internt i BHC. Styret tok oversikten over disse handlingene til etterretning, og har tidligere klart uttrykt at måten engasjementet er behandlet på ikke er akseptabelt. Styret stilte videre flere spørsmål til revisor om hvordan engasjement og saker av denne typen følges opp av revisor og hva styret kan forvente at revisor fanger opp av ikke rutinemessige transaksjoner og eventuell mangelfull saksbehandling.  Revisor vil følge opp spørsmålene i sitt brev etter årsoppgjøret.

**09/01   Regnskap for år 2000.**

Pål Nytveit presenterte regnskapet for tidligere Bergens Skibsassuranseforening for 2000, med vekt på nøkkeltall og utvikling i den underliggende forretningen.

Nytveit viste også en beregning av de synergieffekter som er påvist og kan forventes etter fusjonen.

Revisor opplyste at de var ferdig med revisjonen av regnskapet for 2000, og at den revisjonsberetningen som forelå ikke hadde spesielle merknader av noe slag. Revisjonsberetningen vil bli avgitt når regnskap og beretning er underskrevet av styret.

Styret traff følgende
<b>VEDTAK:</b>

*Regnskapet for 2000, som viser et driftsresultat på minus NOK 15.901.128, godkjennes.*

**10/01   Møte med Foreningens revisor og aktuar.**

Foreningens revisor og aktuar deltok under behandlingen av sak 10 og besvarte spørsmål som ble stilt under behandlingen av regnskapet.

I tillegg redegjorde Ivar Mjelde for hvilke områder revisor vil ha fokus på i 2001.

3

CONFIDENTIAL

NW     000187

**11/01   Styrets beretning for år 2000.**

Styret hadde en del kommentarer og forslag til endringer i det fremlagte utkastet til beretning for 2000.
Med de foreslåtte endringene traff styret følgende

**VEDTAK:**

*Styrets beretning for 2000 godkjennes.*

**12/01   Overordnet strategi for NHC.**

Denne saken ble ikke behandlet.

**13/01   Strategiske retningslinjer for finansinvesteringer.**

Per Gustav Blom redegjorde for hovedlinjene i den strategi for finansinvesteringer som har vært fulgt i
tidligere Bergens Skibsassuranseforening. Administrasjonen anbefaler at hovedlinjene i strategien
beholdes men foreslår at styringen av investeringene utvikles videre ved at det fastsettes flere mål og
risiko kriterier. Styret sluttet seg til anbefalingen og ba om at administrasjonen til neste møte fremlegger
forslag til nye mål og risiko kriterier.

**14/01   Gjenomgang av Hay rapport – godkjennelse av lønnsbudsjett for 2001.**

John Wiik og Per Berge presenterte innholdet i rapport om lønnsstruktur og –nivå i NHC som Hay
Management Consultants har utarbeidet. Styret ba om at det ved senere analyser ble foretatt
sammenligninger med andre grupper, f. eks. rederiene, forsikring / bank samt hele Norge. Hvis mulig bør
også samlet kompensasjon og ikke kun kontant elementet brukes som beregningsgrunnlag.

Styret traff deretter følgende

**VEDTAK:**

*Den foreslåtte ramme på 4,7 % for justeringer av lønn i 2001 godkjennes. Etter dette er budsjettet for
NHC for 2001 godkjent.*

**15/01   Innkalling til ekstraordinær generalforsamling.**

Per Gustav Blom redegjorde for den siste utvikling i Kredittilsynets behandling av søknaden om
godkjennelse av fusjon mellom Unitas og NHC. Kredittilsynet har meddelt Foreningen at paragrafen i de
foreslåtte vedtekter for den fusjonerte foreningen som sier at styret velges av generalforsamlingen ikke vil
bli godkjent. Styret skal velges av representantskapet, som angitt i Forsikringsvirksomhetsloven,
alternativt kan fullmakten delegeres til andre enn styret selv eller generalforsamlingen. På bakgrunn av
Kredittilsynets holdning, vil det alternativ som klart er minst tidkrevende være å innkalle til ekstraordinær
generalforsamling for å godkjenne nye vedtekter der styret, styrets leder og varaleder velges av
representantskapet.

Når nye vedtekter er vedtatt, forventes Kredittilsynet å godkjenne fusjonen i løpet av kort tid.

4

CONFIDENTIAL

NW    000188

Etter at fusjonen er godkjent og registrert i Foretaksregisteret, må det holdes ny ekstraordinær generalforsamling for å velge representanter til de styrende organene i den fusjonerte foreningen.

Styret traff følgende

**VEDTAK:**

*Styrene i Norsk Skipsassuranseforening og Unitas vedtar å innkalle til ekstraordinære generalforsamlinger for å behandle forslag om å endre vedtektene i den fusjonerte foreningen slik at styret, styret leder og varaleder velges av representantskapet og ikke av generalforsamlingen. Styrene anbefaler herved dette forslaget.*

*Styret i Norsk Skipsassuranseforening vedtar videre at det så snart fusjonen er godkjent og registrert i Foretaksregisteret skal innkalles til en ny ekstraordinær generalforsamling for å velge representanter til de styrende organene i Foreningen.*

16/01   Eventuelt.

Det var ikke noe som ble behandlet under denne saken.

Møtet ble avsluttet kl. 15.45.

---------------------------        ---------------------------        ---------------------------
Knut J. Meland                     Bjørn Sjaastad                     Sverre A. Farstad
                                                                       (deltok ikke på møtet)


---------------------------        ---------------------------        ---------------------------
Olav Lunde                         Jan Pedersen                       Tom C. Steckmest
                                                                       (deltok ikke på møtet)

---------------------------                                           ---------------------------
Nils Aardal                                                           Sissel Bøyum Skjelten

5

CONFIDENTIAL

NW    000189

Jan Fosse

Atle Bergshaven

Knut Evensen

Terje Adolfson

Emil Bamborg

6

CONFIDENTIAL

NW   000190

# EXHIBIT 33

**STYREMØTE**

1

**NORSK SKIPSASSURANSEFORENING**

ble avholdt 13. desember 2001 kl. 10.30 i Foreningens lokaler i Rådhusgt. 25, Oslo.

Tilstede var:
                                        Jan Fosse
                                         Knut J. Meland
                                         Terje Adolfsen
                                         Atle Bergshaven
                                         Emil Gamborg
                                         Lars Helge Kyrkjebø
                                         Olav Lunde
                                         Jan Pedersen
                                         Knut Evensen (valgt av de ansatte)
                                         Jan Henrik Hatlem (valgt av de ansatte)

Bjørn Sjaastad og Tom C. Steckmest deltok ikke på møtet.

Fra administrasjonen møtte John Wiik, Torleiv Aaslestad og Per Gustav Blom. Dessuten deltok Greig Rance og Justin Gardner fra General Cologne Re og Udo Martinsohn fra Swiss Re under første del av behandlingen av sak 107/01.

**98/01   Godkjennelse av referat fra styrets møter.**

Utkast til referat fra styremøte i Norsk Skipsassuranseforening 14. november 2001 ble gjennomgått og godkjent.

**99/01   Kopi av protokoll fra møte i representantskapet.**

Det var ikke fremlagt protokoll fra møte i representantskapet.

**100/01   Kopi av protokoll fra møte i kontrollkomiteen.**

Fremlagt utkast til protokoll fra møte i kontrollkomiteen 20. november 2001 ble gjennomgått og tatt til etterretning.

I tilknytning til sak 9 kommenterte John Wiik kontrollkomiteens bemerkning om at aktiviteten i styrende organ i BAL synes å være liten. BAL blir nå benyttet i økende grad. Styret ba om at strategi for og drift av BAL settes på dagsorden i første eller andre møte i 2002.

CONFIDENTIAL

NW    000223

**101/01  Korrespondanse med revisor.**

Fremlagt brev nr. 17 datert 7. november 2001 fra KPMG og Foreningens svar datert 15. november 2001 ble gjennomgått og tatt til etterretning.


**102/01  Den aktuelle situasjonen.**

John Wiik redegjorde for sakene som var omtalt i utsendt notat datert 5. desember 2001. I tilknytning til gjennomgang av markedet og reassuranse bemerket Wiik at 2002 blir et konsolideringsår som skal brukes til å korrigere prising i retning av mer balansert forhold mellom pris og risiko i Foreningens portefølje. Foreningen er videre mer og mer restriktiv med langtidskontrakter. Styret sluttet seg til den restriktive linje som Wiik beskrev i sin gjennomgang.

Torleiv Aaslestad gikk deretter gjennom fremlagt oversikt over utestående garantier. Han beskrev videre det arbeidet som har vært gjort for å bedre prosedyrene for garantistillelse i etterkant av 11.09. Foreningen har blant annet utviklet en egen klausul som gir Foreningen rett til å kreve kontragaranti fra andre selskaper i samme konsern som forsikringstaker. Styret ba administrasjonen vurdere om oversikten kan gjøres mer oppdatert slik at reell eksponering fremkommer og om det er mulig å spesifisere "øvrige ko-assurandører" i større grad. Administrasjonen vil vurdere dette og i tillegg se nærmere på kriteriene for garantistillelse samt prising av garantier. Styrets generelle holdning var å stramme inn kriteriene og prosedyrene for garantistillelse.

Styret tok for øvrig redegjørelsen til etterretning.


**103/01  Status og avkastning finansportefølje.**

Status og avkastning for investeringsporteføljen pr. 30. november 2001 ble tatt til etterretning. Akkumulert avkastning i 2001 var – 22,04 % for aksjeporteføljen, +9,91 % for obligasjonsporteføljen og +2,09 % for totalporteføljen. Referanseindeksen for totalporteføljen viste til sammenligning +0,99 %.


**104/01  Utestående saker for behandling.**

Oversikten ble tatt til etterretning.


**105/01  SCUA Holding B.V. – aksjonæravtale med Gard Services AS.**

Torleiv Aaslestad gikk gjennom den økonomiske stilling i SCUA gruppen. Beregnet egenkapital er i størrelsesorden EUR 2 mill. Budsjettet for 2002 viser et overskudd på EUR 275.000, men inkluderer et underskudd på ca. EUR 160.000 i USA som styret ikke har godkjent.

Når det gjelder utkastet til aksjonæravtale, diskuterer Gard og Foreningen fortsatt eventuell forkjøpsrett for Foreningen til aksjene i SCUA Holding B.V. dersom mer enn 25 % av aksjene i Gard Services AS selges. For øvrig er partene enige om ordlyden.


Styret diskuterte avtalen og forholdet til agenturene og fattet følgende

2

CONFIDENTIAL

NW    000224

**Vedtak:**

*Administrasjonen gis fullmakt til å inngå aksjonæravtale vedrørende SCUA Holding B.V. med Gard Services AS som fremlagt under forutsetning av enighet om Article 9.6 vedrørende utløsningsrett. Inngåelse av aksjonæravtale vedrørende SCUA Holding B.V. forutsetter enighet med Gard Services AS om deling av tap vedrørende SMCO, Inc.*

**106/01  Avtale med DNK.**

Torleiv Aaslestad redegjorde for status i saken. Styret i DNK skal ha ny, full gjennomgang av strategien fremover og DNK er derved satt tilbake i tid i forhold til reorganisering av virksomheten. I mellomtiden løper den nåværende avtale som ble inngått med Unitas videre.

**107/01  Reassuranseprogram for 2002.**

Greig Rance og Justin Gardner fra General Cologne Re gjennomgikk utviklingen i internasjonale forsikrings- og reassuransemarkeder, med hovedvekt på konsekvensene av 11.09. De understreket at kapitalkostnaden har økt vesentlig, hvilket medfører økte rater. Solvens og likviditet blant forsikringsselskapene har også blitt et viktig tema – til nå har 3 "A" ratede selskaper innstilt driften etter 11.09. Et viktig poeng var også at 95 % av erstatningene knyttet til World Trade Center var følgeskader av brannen. Dette har ført til sterk fokusering på vilkår. Rance avsluttet med å understreke GCRe's langsiktige satsing på reassuranse.

Udo Martinsohn presenterte deretter Swiss Re og forretningssyklusene i forsikring. Han understreket behovet for å styre risikotaking gjennom syklusene.

John Wiik gikk så gjennom Foreningens tenkning omkring reassuranse. Som følge av økte priser og mer fokus på kredittkvalitet, har Foreningen ytterligere fokusert på avdekking til finansielt sterke reassurandører. Det er nå kun to Lloyds syndikater som deltar i Foreningens reassuranse, og de har begrensede andeler. Videre foreslår administrasjonen at Foreningen tar høyere egenandeler, i første rekke på LoH og TLO, der lønnsomheten er best.

Med hensyn til krigskontrakten på USD 50 mill., ønsket styret spesifikt "back-up" utover de tre første fulle tapene for den 10 % andel GeneralCologne Re har akseptert.

På grunn av den usikkerhet som råder i markedet, er prosessen med fornyelser fra årsskiftet 2001/2002 ikke kommet så langt som vanlig, og alle deler av reassuranseprogrammene er derfor ikke ferdig forhandlet. Styret fattet derfor følgende.

**Vedtak:**

*Styret godkjenner det forslag til struktur på reassuranse for 2002 som er presentert. Administrasjonen gis sammen med styrets leder og nestleder fullmakt til å sluttforhandle reassuranseprogrammene. Endelig oversikt over reassuranse fremlegges for styret når dette er klart.*

3

CONFIDENTIAL

NWL    000905

**108/01  Budsjett for 2002.**

John Wiik og Per Gustav Blom presenterte budsjettet for 2002 med vekt på sentrale forutsetninger og budsjettets følsomhet for endringer i disse forutsetningene. Budsjettet viser et negativt driftsresultat stort USD 1.239.000.

Styret diskuterte forutsetningene for budsjettet og stilte videre spørsmål ved eventuelle merkostnader ved dagens organisasjonsstruktur i forhold til optimal struktur. Administrasjonen vil komme tilbake til dette.

Styret traff deretter følgende

**VEDTAK:**

*Budsjettet for 2002, som viser et driftsresultat på minus USD 1.239.000, godkjennes.*

**109/01  Gjensidighet – hva består det av og hvordan kan gjensidigheten synliggjøres for medlemmene.**

John Wiik presenterte administrasjonens vurdering av hva gjensidigheten består i og hvordan dette kan synliggjøres for medlemmene. Tilsvarende presentasjon vil bli gitt til representantskapet 14. desember. Styret tok redegjørelsen til etterretning.

**110/01  Juridisk avdeling.**

Styrets diskuterte det fremlagte forslag til opprettelse og oppbygging av egen juridisk avdeling i Foreningen. Styret var positivt til forslaget, og understreket at Foreningen må ha ambisjon om å bygge opp en sterk intern, juridisk avdeling. I forhold til det fremlagte forslag, må siktemålet derfor være at Per-Åge Nygård over tid skal bruke 100 % av sin tid på denne stillingen.

Styrets sluttet seg til administrasjonens anbefaling, og traff således følgende

**VEDTAK:**

*Foreningen oppretter intern juridisk avdeling og Per-Åge Nygård overføres til denne avdelingen, i første omgang på deltid.*

**111/01  Møteplan styrende organer 2002.**

Det fremlagte forslag til møteplan ble gjennomgått. Møtet som var foreslått avholdt tirsdag 24. september 2002 flyttes til onsdag 25. september. For øvrig var det ikke noen endringer i møteplanen.

**112/01  Eventuelt.**

Brev fra Kredittilsynet datert 6. desember 2001 vedrørende stedlig inspeksjon i Foreningen i september ble gjennomgått. Styret hadde ingen spesielle kommentarer til brevet, som ble tatt til etterretning.

Jan Pedersen viste til behandlingen av intern organisasjon i forrige møte, da han ikke hadde anledning til å delta. Han understreket at styret etter hans oppfatning må gi sterk støtte til administrerende direktør i

4

CONFIDENTIAL

NW   000000

denne saken og at administrerende direktør må gis fullmakt til å treffe de tiltak som er nødvendige. Styret sluttet seg til dette.

Per Gustav Blom redegjorde for konkursalternativet for SMCO, Inc. basert på notat til styret datert 19. november 2001. Styret traff følgende

**Vedtak:**

*Styret gir administrasjonen fullmakt til å arbeide videre med styrt avvikling av SMCO, Inc. basert på total kostnad ved avviklingen minimum USD 600.000 lavere enn hva det vil koste å dekke alle krav 100 %. Det må således foretas avkorting i oppgjør med enkelte kreditorer. I forhold til beregnet totalt tap fremlagt for styret 14. november 2001 innebærer dette at totalt tap ikke skal overstige USD 4,8 mill. Tapet kan dog endres som følge av endring i forutsetninger, i første rekke rentenivå og derved diskonteringsfaktor for beregning av pensjonsforpliktelser.*

Styrets Formann refererte til sak 86/01 vedrørende godtgjørelse til administrerende direktør. Administrerende direktør hadde brakt opp spørsmålet om et rente og avdragsfritt lån på inntill kr 3 mill. Styret diskuterte saken og ga uttrykk for på prinsipielt grunnlag at en slik ordning ikke var ønskelig. Etter en videre diskusjon ble det fattet følgende

**Vedtak:**

*Lønnsgodtgjørelse til administrerende direktør fastsettes til Kr 2,250,000.- pr år med virkning fra 1. Januar 2001. For øvrig er beslutningen til sak 86/01 uforandret.*

Det var ikke flere saker til behandling under denne posten.

Møtet ble avsluttet kl. 17.30.

| | | |
|---|---|---|
| Jan Fosse | Knut J. Meland | Terje Adolfsen |
| Atle Bergshaven | Erik Gamborg | Lars Helge Kyrkjebø |
| Olav Lunde | Jan Pedersen | Bjørn Sjaastad (Ikke til stede) |
| Tom C. Steckmest (ikke til stede) | Knut Evensen | Jan Henrik Hatlem |

5

CONFIDENTIAL

# EXHIBIT 34

**Blom, Per Gustav**

**Fra:** Erik Kappelin [ekappelin@hotmail.com]

**Sendt:** 12. januar 2001 23:10

**Til:** per.blom@norclub.no

**Kopi:** arne.selvik@aff.no

**Emne:** Re: LETTER TO FORMER SMCO EMPLOYEES.

Dear Per,

I have received a request from Tom Ostensen regarding his unused vacation days from SMCO and SMQI. According to our notations he is due 19. 5 days from SMCO, which covers his time up to June 30, 2000. The amount due for said period comes to $20,202. Kindly inform if said amount can be paid out. Regarding his claim for vacation due from SMQI i must say that I'm not aware of the agreement he had regarding SMQI. He was suposed to buy the company but whether this entidled him to vacation i don't know. Maybe Arne who reads this in copy can clarify. I know that he was on vacation for about a week in the fall so it can't be that many days he is due.

Best regards,

Erik Kappelin

>From: "Blom, Per Gustav"
>To: "'EKappelin@smcogroup.com'" , "'ekappelin@hotmail.com'"
>Subject: LETTER TO FORMER SMCO EMPLOYEES.
>Date: Fri, 12 Jan 2001 15:24:13 +0100
>
>Erik,
>
>Vedlagt følger brev til de tidligere SMCO ansatte. Med referanse til vår
>tidligere samtale ber jeg om at du sender ut dette brevet så snart som
>mulig. Brevet må også sendes Husjord og Cederstav.
>
>Ha en god helg (jeg forstår dere har fri på mandag).
>
>Per Gustav
>
> <>
>< < ex-employeeltr_.doc >>

Get your FREE download of MSN Explorer at http://explorer.msn.com

30.06.2005

NW  001525

# EXHIBIT 35

**Blom, Per Gustav**

| | |
|---|---|
| **Fra:** | Midttun, Tom [Tom.Midttun@Gard.no] |
| **Sendt:** | 5. februar 2001 08:55 |
| **Til:** | Per Gustav Blom (E-mail); Karsten Espelid (E-mail) |
| **Emne:** | Negotiated settlement - spreadsheet |
| **Vedlegg:** | Negotiated Settlement.xls |



Negotiated
Settlement.xls (18 ..

Det som mangler er;

Oversikt over fordringer (uoppgjorte reiser etc) og motkrav (bonus, feriepenger etc)
Hvorvidt lånene er tinglyst / prioritet

 <<Negotiated Settlement.xls>>

Tom Midttun
Senior Vice President

Phone +47 55 17 40 11        Mobile +47 99 28 40 11        Fax: 55 17
40 01
www.gard.no

1

NW 001769

Negotiated Settlement

| Name | Mortgage | Other receivables | Other liabs | NQ Pension prior negotiated settlement | % | Security | Comments | Solutions | Effekt | "Dividende" si 25% | "Utregl-kontura-kostnad" |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cederstav | 60 000,00 | | | 196 455,80 | 31 % | | | 196 455,80 Full ut i ingen avkortning: handel i god tro / styregodkient | - | 49 113,95 | 147 341,85 |
| Jones | 65 941,54 | | | 46 759,49 | 141,1% | | | 31 798,45 68% settlement | (14 963,04) | 11 699,87 | 20 106,58 |
| Kiilo | 30 752,45 | | | 55 130,73 | 68 % | | | 37 488,90 68% settlement | (17 641,83) | 13 788,68 | 23 709,21 |
| Llorca | 38 707,64 | | | 56 937,39 | 68 % | | Total mortgage is USD 73,707 of which USD 38,707 receivable (balance to be written off over 10 years) - *) subject reconfirmation Ekapsein | 38 717,43 68% settlement | (18 219,96) | 14 234,35 | 24 483,08 |
| Naysar /Østensen | 116 105,28 | | 20 002,00 | 42 965,41 | 270 % | | SMCO/SMOI: USD 20,202 (holdays). | 29 216,48 68% settlement | (13 748,93) | 10 741,35 | 18 475,53 |
| Østensen | | | | 444 005,03 | 66 % | | | 222 002,62 50% settlement??? | (222 002,62) | 111 001,26 | 111 001,26 |
| Huspid | 305 000,00 | | | 179 227,14 | 0 % | | | 179 227,14 Full ut i ingen avkortning: handel i god tro / styregodkient | - | 44 606,79 | 134 420,38 |
| | 616 506,91 | - | 20 002,00 | 1 021 480,99 | 59 % | | | Oppgjørels ramme | (266 576,26) | | 479 534,46 |

Effekt 734 904,71

Oppsier 72 %

Oppsier unntatt CHICS 59 %

01.07.2005 10:18

# EXHIBIT 36

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**************************************************

| | |
|---|---|
| SCANDINAVIAN MARINE CLAIMS OFFICE, INC,. | Civil Case No. |
| Plaintiffs | 3:02 CV 678 (RNC) |
| VS. | |
| TOM OSTENSEN | A JURY TRIAL |
| SIRI OSTENSEN | IS DEMANDED |
| Defendants | |
| VS | |
| SCANDINAVIAN MARINE CLAIMS OFFICE, INC,. | |
| SCANDINAVIAN UNDERWRITERS AGENCY, also | |
| Known as SCUA AMERICAS, INC,. S.M.C.O. A.S., | |
| ANDNORWEGIAN HULL CLUB | |
| Defendants on the Counterclaim | November 7, 2002 |

**************************************************

## COUNTERCLAIM

### THE PARTIES

1.    At all times relevant hereto, the defendant Tom Ostensen is an individual residing in the Town of Greenwich, State of Connecticut. The defendant Siri Ostensen is the wife of the defendant Tom Ostensen, and they reside together.

2.    At all times relevant hereto, the plaintiff Scandinavian Marine Claims Office, Inc. (SMCO) is a New York Corporation, which maintained places of business in Stamford, Connecticut, Coral Gables, Florida, and Houston, Texas.

1

3.  At all times relevant hereto, the plaintiff Scandinavian Underwriters Agency also known as Scua Americas, Inc (SCUA) is upon information and belief, a Delaware corporation which maintains its principal places of business in Coral Gables Florida and Houston, Texas. SCUA is also the successor corporation to SMCO, and is its alter ego.

4.  At all times relevant hereto, the defendant SMCO A.S. is a foreign corporation domiciled in the City of Bergen, Country of Norway, which owned, operated and controlled SMCO, and now owns, operates and controls SCUA, and upon information and belief maintains offices in the United States, Europe, Middle East and Japan.

5.  At all times relevant hereto, the defendant Norwegian Hull Club (NHC) is a corporation domiciled in the City of Bergen, Country of Norway, and did business in the State of Connecticut through its subsidiaries, SMCO A.S., SMCO and SCUA, in which it owns and operates a controlling interest through a two-thirds controlling ownership of SMCO A.S.

JURISDICTION

6.  Jurisdiction is properly in this Court by virtue of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1001 et seq., including under 29 U.S.C. 1132, and by virtue of this case involving the laws of the United States, pursuant to 28 U.S.C. §1331. This Court also has jurisdiction in light of the diversity of citizenship between plaintiffs and defendants (28 U.S.C. §1332), as hereinabove alleged. The amount in controversy, exclusive of interest and costs exceeds $75,000.00.

7.    Jurisdiction is also properly in this Court by virtue of F.R.C.P. §13 and 28
U.S.C. 1367(a).

THE PENSION PLANS

8.    At all times relevant hereto, the plaintiff SMCO, and the defendants SCUA,
SMCO A.S. and NHC were directly or indirectly plan administrators for
certain qualified and non-qualified benefit pension plans in which the
defendant Tom Ostensen participated as an employee.

9.    From October, 1990 through and including December 31, 2000, the
defendant Tom Ostensen was employed by the plaintiff SMCO, and from
October, 1990 through June 30, 2000, he was its President and manager
of its offices. The defendant Tom Ostensen was stationed in SMCO's
Connecticut office, at One Landmark Square, Stamford, Connecticut.

10.   SMCO, and SCUA, its successor, including its Stamford, Connecticut
office, were and are a "captive" maritime claims adjustment office for
claims against vessels insured by the NHC, which is a marine underwriter.

11.   As an employee of SMCO, the defendant Tom Ostensen was covered by
a certain defined benefit pension plan and a money purchase plan, which
together are referred to as the Qualified Pension Plan, and which falls
within the purview of ERISA, 29 U.S.C.1001 et seq.

12.   The defendant was also covered by a certain supplemental or wrap-
around defined benefit plan available only to certain select senior
management personnel, which is hereinafter referred to as the Non-
Qualified Pension Plan. The Non-Qualified Pension Plan was contained in
separate written agreements among the plaintiff SMCO and each of the

3

plaintiff SMCO's senior employees, including the defendant, and which also may fall within the purview of ERISA. A copy of the Non-Qualified Pension Plan is annexed hereto as Exhibit A.

13.    As spouse and contingent beneficiary to the defendant Tom Ostensen's pension benefits, the defendant Siri Ostensen was a participant and/or an intended third party beneficiary of said plans.

14.    The Non-Qualified Pension Plan was designed to attract and keep top level employees who would not have enough service time at normal retirement age to receive their maximum Qualified Pension Plan benefits, by making it possible to reach a pension benefit equivalent to 60% of their last three years average salary at normal retirement age (Final Average Compensation).

15.    Under the Pension Plans, the defendant Tom Ostensen was entitled to receive up on reaching normal retirement age an annual dollar amount equal to 60% of his Final Average Compensation. As explained in SMCO's Consolidated Financial Statements, the funding of the Non-Qualified Plan as based on amounts collected from Mortgage notes receivable from related parties (also referred to as "housing loans"), certain insurance polices, plus an additional funding as required from time to time as advised by the Plan Administrator.

16.    The Non-Qualified Pension Plan was adopted by SMCO on October 19, 1992.

4

17.    In maintaining his employment with SMCO, the defendant Tom Ostensen, relied on the benefits promised by both the Qualified and Non-Qualified Pension plans, and had foregone other employment and investment opportunities in reliance of the promise of said benefits.

18.    In accordance with the plan, the Non-Qualified Plan was to be funded through life insurance purchased by SMCO, the business assets and revenues of SMCO, and obligations owed to SMCO under certain "housing loans" made to the plans' participants.

19.    The "housing loans" that funded in part the Non-Qualified Plan included the "first note" and "second note", annexed to the plaintiff's complaint as Exhibits A, and B, respectively

20.    The defendant Tom Ostensen's "housing loans" were outstanding to SMCO at the time of the termination of his employment, as were "housing loans" to the other participant members of the Non-Qualified Pension Plan and other employees of the company, all of which "housing loans" funded in part, the Non-Qualified Pension Plan.

21.    Further, upon information and belief, SMCO and/or one or more of its parents or affiliated companies, including SMCO A.S., and NHC, acting on their own behalf or on behalf of SMCO, wrongfully cancelled the life insurance policies, which also funded the Non-Qualified Pension Plan.

THE PURPORTED DISSOLUTION OF SMCO

22.    On March 3, 1998, the plaintiff SMCO at the direction of the defendant NHC decided to downsize the Stamford SMCO office.

23. On June 21, 2000, the directors of the plaintiff SMCO and the defendant SMCO A.S. who are controlled by NHC, determined and resolved, among other things, that the Stamford SMCO office would be closed, that SMCO would then change its name to SCUA, and that the defendant Tom Ostensen would be terminated as president of SMCO effective July 1, 2000, but would remain on its payroll through December 31, 2000.

24. Also on or about June 21, 2000, the directors of SMCO, acting at the direction of SMCO A.S. and NHC, resolved that final proposals for severance packages, including pension agreements would be presented for "Board Sanction".

25. Also, on or about June 21, 2000, it was determined that the name SMCO would cease to exist but that certain select creditors, with whom SCUA, SMCO A.S. and NHC would continue to do business or whom had personal or corporate or other guaranty's, but not including the defendants Tom and Siri Ostensen or other employees or beneficiaries of said pension plans similarly situated, would be paid and compensated out of its assets and/or the assets of SCUA, SMCO A.S, and NHC.

26. Also on or after June 21, 2000, said certain select creditors were paid and compensated, but the defendant Tom Ostensen was not, and SMCO, at the direction of NHC and SMCO A.S., otherwise dispossessed itself of all of its business, corporate assets and bank accounts, transferring same to SCUA, and/or SMCO A.S. and/or NHC.

27.    Sometime after December 31, 2000, since SMCO's business and assets were transferred to SCUA and/or NHC, the defendant Tom Ostensen and other employees similarly situated as participants in said Non-Qualified Pension Plans, including their General Counsel, Manuel Llorca, and Margaret Killip, have been informed by personnel at SMCO, SMCO A.S., and NHC, that their pension rights would not or may not be honored due to the purported insolvency of SMCO.

28.    The defendant Tom Ostensen has been further informed some time after December 31, 2000, that SMCO will not credit his prior years of service with Marine Defense Group, a company he owned and with whom he was employed until it was acquired by SMCO in 1990, despite having previously being assured by the Qualified Plan Administrators and the Non-Qualified plan administrators that such credit would be given.

29.    Further, the defendant Tom Ostensen has been informed some time after December 31, 2000, that SMCO will not properly credit his years of service with SMCO under the defined benefit plan at the previously agreed rate of 2.75% of Final Average Compensation, but that his defined benefit plan payment shall be calculated at 2.00% of Final Average Compensation.

30.    Further, the defendant Tom Ostensen has been informed some time after December 31, 2000, that the Qualified Benefits to which he and the defendant Siri Ostensen are entitled shall be substantially less than as is called for under the terms of the Qualified Plans.

## FIRST CAUSE OF ACTION (VIOLATION OF ERISA)

31. Paragraphs 1.-30 are hereby realleged and incorporated in this Paragraph 31. of this, the FIRST CAUSE OF ACTION.

32. On divers times and occasions, by words and deeds, the plaintiff SMCO has repudiated their obligations to the defendant Tom Ostensen under the Qualified and Non-Qualified Pension plans.

33. Upon information and belief, plaintiff has manipulated the acts of and/or information utilized by and/or instructions given to purportedly independent auditors and others in order to present false and/or misleading statements of benefits due to the defendant Tom Ostensen, in an attempt to induce him to rely upon such false or misleading statements and accept benefits much smaller than those to which he is entitled pursuant to the provisions of the Qualified and Non-Qualified Pension plans hereinabove alleged.

34. Plaintiff has by virtue of the above enumerated and other acts and/or omissions, violated various provisions of ERISA, including but not limited to ERISA §§510, 29 U.S.C. 1140, entitling the defendants Tom Ostensen and Siri Ostensen to relief under the provisions of ERISA, including, but not limited to ERISA §502, 29 U.S.C. §1132.

35. As a result of said wrongful acts, omissions and repudiation, the defendant has suffered damages and will continue to do so into the future.

36. As a further result of said wrongful acts, omissions and repudiation of the Qualified and Non-Qualified Pension Plans, the defendants have incurred counsel fees.

## SECOND CAUSE OF ACTION (BREACH OF CONTRACT)

37. Paragraphs 1.-36 are hereby realleged and incorporated in this Paragraph 37. of this, the SECOND CAUSE OF ACTION.

38. The Non-Qualified Pension plan constitutes a contract between the plaintiff and defendant Tom Ostensen.

39. The plaintiff has anticipatorily repudiated said contract.

40. As a result of said repudiation, the defendants Tom Ostensen and Siri Ostensen have suffered damages and will suffer damages in the future.

## THIRD CAUSE OF ACTION (DETRIMENTAL RELIANCE)

41. Paragraphs 1.-40 are hereby realleged and incorporated in this Paragraph 36. of this, the THIRD CAUSE OF ACTION.

42. The defendants Tom and Siri Ostensen relied upon the promises and representations made by the plaintiff SMCO, as well as the defendants SMCO A.S., NHC and SCUA that the Qualified and Non-Qualified Pension Plans would fund the defendant Tom Ostensen's and his beneficiary, the defendant Siri Ostensen's retirement to the extent and manner provided in said plans, respectively.

43. Said reliance was reasonable, and such reliance was intended by the plaintiffs to encourage the defendant Tom Ostensen to forego other employment and investment opportunities.

44. The defendant Tom Ostensen has suffered damages by virtue of his reliance on said promises and representations.

## FOURTH CAUSE OF ACTION (COMMON LAW FRAUD)

45. Paragraphs 1.-44 are hereby realleged and incorporated in this Paragraph 40. of this, the FOURTH CAUSE OF ACTION.

46. Despite assurances, promises and representations made to the defendant Tom Ostensen in 2000 by SMCO, SCUA, SMCO A.S. and NHC, that the downsizing and eventual extinguishment of SMCO would not result in a loss of his pension benefits, by divers words and deeds since, the plaintiffs have manifested an intent to avoid said obligations.

47. Upon information and belief, said assurances, promises and representations made by the plaintiffs were knowingly false and fraudulent when made.

48. As a result of the plaintiff's false and fraudulent representations, the defendant has suffered damages.

49. As a further result of the plaintiff's false and fraudulent representations the defendant Tom Ostensen is entitled to common law punitive damages.

## FIFTH CAUSE OF ACTION (CUTPA)

50. Paragraphs 1.-49 are hereby realleged and incorporated in this Paragraph 50. of this, the FIFTH CAUSE OF ACTION.

51. The plaintiffs' false and misleading representations were deceitful, fraudulent, and unfair within the meaning of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a et seq, and it thereby violated said statute.

52. As a result of said false and misleading representations, the defendants Tom & Siri Ostensen have suffered an ascertainable loss.

53. As a further result of said false and misleading representations, the defendants have incurred counsel fees.

54. As a further result of said false and misleading representations, the defendants are entitled to statutory punitive damages.

SIXTH CAUSE OF ACTION (FRAUDULENT TRANSFER)

55. Paragraphs 1.-54 are hereby realleged and incorporated in this Paragraph 55. of this, the SIXTH CAUSE OF ACTION.

56. Upon information and belief, and based upon such information and belief, the defendants allege, that SMCO has conveyed, transferred and/or secreted the assets of SMCO to said SCUA, SMCO A.S. and NHC, so that SMCO is unable to pay its debts as they mature, including, but not limited to, the Non-Qualified Pension Plan.

57. Said conveyances and transfers of assets were made for the purpose of frustrating the purposes of the Non-Qualified Pension Plans, and were designed to unfund it, thereby depriving the defendant and others similarly situated of their rightful compensation and benefits.

58. Said conveyances and transfers also rendered SMCO insolvent as defined in §52-552a et seq., of the Connecticut General Statutes, said statute being also known as the Connecticut Uniform Fraudulent Transfer Act.

59. Said conveyances and transfers were fraudulent and without fair consideration and violate the provisions of said Connecticut Uniform Fraudulent Transfer Act.

11

60. The defendants are entitled to have said conveyances and transfers set aside and to have damages and attorneys fees assessed against SMCO.

SEVENTH CAUSE OF ACTION (INTENTIONAL INTERFERENCE WITH CONTRACT AS TO SCUA, SMCO A.S. & NHC)

61. Paragraphs 1.-60 are hereby realleged and incorporated in this Paragraph 61. of this, the SEVENTH CAUSE OF ACTION.

62. At all times relevant hereto, SCUA, SMCO A.S, and NHC. have been aware of the existence of the Non-Qualified Pension Plan, and SMCO's corresponding obligations to the defendants.

63. In directing the closure of SMCO, the transfer and conveyance of all of the assets of SMCO and the payment of creditors other than the beneficiaries of the Non-Qualified and Qualified Pension Plans, the defendants SCUA, SMCO A.S, and NHC have tortiously interfered with the contractual relations of the defendant Tom Ostensen with SMCO.

64. As a result of said tortious interference with contractual relations, the defendants have suffered damages.

EIGHTH CAUSE OF ACTION (SCUA AS LIABLE SUCCESSOR TO SMCO)

65. Paragraphs 1.-64 are hereby realleged and incorporated in this Paragraph 65. of this, the EIGHTH CAUSE OF ACTION.

66. SCUA and/or NHC, as successor to the assets and obligations of SMCO, are liable to the plaintiffs for all obligations, debts and claims for which SMCO would have been liable to them, including but not limited to, payment of plaintiffs' Pension benefits hereinabove alleged.

12

NINTH CAUSE OF ACTION (DECLARATORY JUDGMENT AS TO ALL PARTIES)

67.    Paragraphs 1.-66 are hereby realleged and incorporated in this Paragraph 67. of this, the NINTH CAUSE OF ACTION.

68.    The rights accruing to defendant Tom Ostensen and Siri Ostensen under the Qualified and Non-Qualified Pension plans entitles them to payments of benefits in the future

69.    The plaintiffs have anticipatorily repudiated said payments of benefits.

70.    The defendant Tom Ostensen seeks and is entitled to a declaratory judgment affirming the obligations of SMCO, SCUA, SMCO A.S, and NHC as said benefits fall due.

TENTH CAUSE OF ACTION (TOM OSTENSEN V. SMCO, SCUA, SMCO A.S, and NHC -WAGES WITHHELD)

71.    Paragraphs 1.-70 are hereby realleged and incorporated in this Paragraph 71. of this, the TENTH CAUSE OF ACTION.

72.    The plaintiff, and as plaintiff's alter ego and/or successors, SCUA, SMCO A.S, and NHC have failed to pay the defendant Tom Ostensen his full compensation, including salary and reimbursable expenses, accrued and incurred, respectively, during his tenure at SMCO.

73.    Said compensation constitutes wages within the meaning of the Connecticut Wage and Hour Laws, including C.G.S. §31-72, et seq.

74.    As a result of said failure, the defendant Tom Ostensen is entitled to damages, double damages and attorneys fees, pursuant to said statute.

ELEVENTH CAUSE OF ACTION ( BOTH DEFENDANTS V. SMCO, SCUA, SMCO A.S, and NHC) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

75. Paragraphs 1.-74 are hereby realleged and incorporated in this Paragraph 75. of this, the ELEVENTH CAUSE OF ACTION.

76. In denying the defendants their Qualified and/or Non-Qualified Pension benefits, the plaintiff intended to inflict emotional distress on the defendants, or they knew, or should have known, that emotional distress was the likely result of their conduct.

77. The repudiation of pension benefits to long-standing employees of advancing years such as the defendant Tom Ostensen and his spouse, Siri Ostensen is extreme and outrageous conduct.

78. The defendants have in fact suffered severe emotional distress as a result of the plaintiff's repudiation of his pension benefits.

79. As a result thereof, the defendants have suffered damages.

TWELFTH CAUSE OF ACTION ( BOTH DEFENDANTS V. SMCO, SCUA, SMCO A.S, and NHC) CONTINUING OPERATION OF AN INSOLVENT COMPANY TO THE DETRIMENT OF COMPANY'S CREDITORS AND EMPLOYEES

80 Paragraphs 1.-79 are hereby realleged and incorporated in this Paragraph 80. of this, the TWELFTH CAUSE OF ACTION.

81 Upon information and belief, plaintiff SMCO was technically insolvent as of approximately 1991, but was kept in operation to service the needs of NHC and SMCO A.S.

82 Plaintiff's insolvency was hidden from the defendant Tom Ostensen, as well as other employees and creditors of SMCO.

14

83    Defendant Tom Ostensen was encouraged to continue employment with SMCO as a result of NHC, SMCO A.S., and SMCO's continued operation of SMCO and their continued non-disclosure about the fact that it was insolvent and would be unable to pay its retirement benefits under the Non-Qualified Plan.

84    By reason of the foregoing, the defendants Ostensen have been damaged in an amount to be established at trial, but in excess of $75,000.

THIRTEENTH CAUSE OF ACTION ( BOTH DEFENDANTS V. SCUA, SMCO A.S, and NHC) LIABILITY AS ALTER EGOS OF SMCO

85    Paragraphs 1.-84 are hereby realleged and incorporated in this Paragraph 85. of this, the THIRTEENTH CAUSE OF ACTION.

86    At all relevant times, the defendants SCUA, SMCO A.S., and NHC exercised complete domination and control over the finances, policy and business practices of SMCO so that SMCO was a mere instrumentality of said defendants, and had no separate mind, will or existence of its own. SMCO existed solely to serve the business interests in the United States of defendants SCUA, SMCO A.S., and NHC.

87    The domination and control by defendants SCUA, SMCO A.S., and NHC was used to commit fraud and wrong, and to perpetrate the violation of statutory and other legal duties owed to the defendants Tom and Siri Ostensen and others similarly situated.

88    By reason of the foregoing, the defendants Tom and Siri Ostensen
      have incurred damages in an amount to be established at trial, but in
      excess of $75,000.00.

WHEREFORE, the defendants claim as to SMCO, SMCO A.S., SCUA and NHC:

1.      A Judgment dismissing the plaintiff's complaint.

2.      A Set-Off of against any monies due SMCO under the "housing loans" alleged in plaintiff's complaint in the amount of damages due the defendants for, among other claims set forth above, the Non-Qualified Pension Plan.

3.      Money damages.

4.      Counsel fees under ERISA.

5.      Common law punitive damages.

6.      Punitive damages and counsel fees under CUTPA, Connecticut General Statutes §42-110a et seq.

7.      A declaratory judgment fixing the rights and responsibilities of the parties to the Qualified and Non-Qualified Pension Plans.

8.      That all fraudulent transfers between the defendants be set aside.

9.      Such other relief as in law or equity as may appertain.

10.    Money damages for wages and reimbursable expenses withheld.

11.    Double damages and counsel fees pursuant to Connecticut General Statutes §31-72.

THE DEFENDANTS
TOM OSTENSEN
SIRI OSTENSEN

BY: _____
THOMAS M. CASSONE
BELLO, LAPINE & CASSONE
600 Summer Street
Stamford, CT 06901
Federal Bar No. ct 06827
Telephone (203) 348-4244
Facsimile (203) 357-7208

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing Proposed Counterclaim was mailed first class mail, postage pre-paid to the following on the 7th of November, 2002.

Dorit S. Heimer
Madeline F. Grossman
Levett Rockwood P.C.
33 Riverside Avenue
P.O. Box 5116
Westport, CT 06880

Donald J. Kennedy
Roxanna Q. Nazari
Carter, Ledyard & Milburn
2 Wall Street
NY, NY 10005

THE DEFENDANTS
TOM OSTENSEN
SIRI ØSTENSEN

BY:
THOMAS M. CASSONE
BELLO, LAPINE & CASSONE
600 Summer Street
Stamford, CT 06901
Federal Bar No. ct 06827
Telephone (203) 348-4244
Facsimile (203) 357-7208

18

## CERTIFICATION OF SERVICE
## ERISA COMPLAINT PURSUANT TO
## 29 U.S.C. 1132 (h)

I hereby certify that a copy of the foregoing Proposed Counterclaim was mailed

by certified mail, return receipt requested postage pre-paid to the following on the

day of          , 2002.

Hon. Elaine L. Chao
Secretary of Labor
200 Constitution Avenue NW
Washington, D.C. 20210

Hon. Paul H. O'Neill
Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

THE DEFENDANTS
TOM OSTENSEN
SIRI OSTENSEN


BY: _____
THOMAS M. CASSONE
BELLO, LAPINE & CASSONE
600 Summer Street
Stamford, CT 06901
Federal Bar No. ct 06827
Telephone (203) 348-4244
Facsimile  (203) 357-7208

19